***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Glenn. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Glenn with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All the parties are properly before the North Carolina Industrial Commission and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject *Page 2 
matter. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between the defendant-employer and plaintiff at all relevant times herein.
3. Defendant-employer was an approved self-insured with Ryder Service Corporation acting as its administrator at all relevant times herein.
4. Plaintiff's average weekly wage was $729.92 per week, yielding a compensation rate of $486.63 per week.
5. Plaintiff sustained an injury on or about December 23, 1998 while in the course and scope of his employment with defendant-employer. Defendant accepted plaintiff's claim pursuant to a Form 60 with the same being completed on or about September 15, 1999, stating that plaintiff had been paid disability benefits beginning on December 24, 1998 at a rate of $486.63 per week.
6. Plaintiff returned to work on or about May 16, 1999 with defendant-employer at his regular rate of pay and continued to work until September 15, 1999 when he was taken out of work and defendant resumed paying plaintiff disability benefits in the amount of $486.63 per week.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 56 years old at the time of the hearing before the deputy commissioner, has completed high school, attended community college and taken some courses *Page 3 
in auto repair. He had worked as a truck driver for Ryder for about four months when he suffered an admittedly compensable injury by accident on December 23, 1998. Following an ice storm, plaintiff exited his truck and began to slip, so he grabbed the handrail with his left hand and dangled for a few seconds until he dropped down to his feet on the ground.
2. After this incident, plaintiff saw Dr. John L. Bond on December 28, 1998. Dr. Bond had previously treated plaintiff for reasons unrelated to the injury by accident. After examining plaintiff, Dr. Bond suspected he suffered from a sprain. Dr. Bond prescribed Vicodin and took plaintiff out of work. Plaintiff continued treating with Dr. Bond with a course of treatment involving injections and narcotic pain medications, but no surgical intervention.
3. Plaintiff's symptoms did not improve and he was referred to Dr. John A. Wilson. Dr. Wilson caused an MRI to be performed of plaintiff's spine and he found the results to be normal with minimal degenerative changes and osteophytic ridges, and showed no significant cord compression. Concluding there was no injury to plaintiff's neck, Dr. Wilson released plaintiff to return to work and recommended that he see an orthopedist to address his shoulder complaints. At this point, plaintiff returned to light duty work with the employer in May 1999.
4. On June 2, 1999, plaintiff was seen and examined by Dr. Walton W. Curl, an orthopedist. Dr. Curl caused an MRI of the left shoulder to be done and it suggested cystic lesions in the suprascalpular notch, but revealed no rotator cuff tear or other indication that surgical intervention would be required. Dr. Curl opined that plaintiff's injury was "largely cervical and soft tissue related." At this point, within six months of the injury date, the neurosurgeon ruled out a diagnosable cervical injury, suspecting problems with the shoulder, and the orthopedic surgeon ruled out surgical problems with the shoulder, suspecting that the root of plaintiff's complaints must have been cervical. *Page 4 
5. Dr. Bond continued to prescribe narcotics based upon plaintiff's subjective reports of pain. By August 30, 1999, Dr. Bond noted that plaintiff's prior job in "truck driving is out of the question," and plaintiff was restricted to "modified work only if available." Dr. Bond did not release plaintiff to regular duty work, and defendant-employer's temporary duty program ended on September 21, 1999. Plaintiff was released from employment, and as of the date of the hearing before the deputy commissioner, had not worked since that time.
6. Plaintiff saw Dr. John DePerczel for an independent medical examination (IME) on September 28, 1999. Dr. DePerczel suggested an EMG to determine whether there was a brachial plexopathy or some other neurologic injury. Dr. Richard D. Bey conducted nerve conduction studies and an EMG which yielded normal results on November 30, 1999. A second MRI to the cervical spine conducted on November 18, 1999 revealed no significant changes from plaintiff's first MRI.
7. Plaintiff continued treating with Dr. Bond into 2000, and although all of the objective testing of plaintiff's complaints were normal and plaintiff displayed no signs of improvement, plaintiff's reports of pain escalated. A second course of nerve conduction studies and an EMG to the left upper extremity conducted by Dr. Bey on March 23, 2000 yielded normal results, and specifically confirmed there was "no evidence of dorsal scapular, suprascapular, axillary or other mononeuropathy, brachial plexopathy or cervical radiculopathy affecting the left shoulder."
8. Plaintiff underwent a functional capacity evaluation (FCE) on April 17, 2000 which revealed that, despite his subjective complaints, plaintiff was capable of working at the medium duty level, meaning he was "capable of performing the tasks associated with driving a truck with either or both hands as needed." After reviewing the FCE results, and despite the fact *Page 5 
plaintiff had never undergone surgery and was capable of performing medium duty work with both arms, Dr. Bond filled out a Form 25R assigning a 35% PPD rating to plaintiff's left upper extremity on May 16, 2000. Further, Dr. Bond opined that plaintiff should have a fifteen-pound lifting restriction and was not capable of driving a truck. After the FCE, plaintiff began a course of vocational rehabilitation provided by defendants with Ms. Debbie Moreau in July 2000.
9. Plaintiff continued complaining of pain and treating with Dr. Bond, and, again without any objective findings, stated on September 18, 2000 that plaintiff was only going to be able to perform sedentary work at the waist level only on the left side. Plaintiff's reports of pain and weakness continued, and he did not get any better under Dr. Bond's care. In January 2001, the vocational rehabilitation professional working with plaintiff began making notes that plaintiff was not fully participating in job search efforts.
10. On May 23, 2001, plaintiff returned to orthopedist Dr. Curl who concluded that any shoulder injury plaintiff may have suffered had resolved, as there was no shoulder pathology secondary to his injury. Vocational rehabilitation efforts continued, but plaintiff was exhibiting overt behaviors inconsistent with a diligent job search such as listing his PPD rating and work restrictions on job applications. On February 21, 2002, the Industrial Commission ordered plaintiff to comply with reasonable vocational rehabilitation services.
11. For the remainder of 2001 through June 2002, Dr. Bond continued following plaintiff's care by administering injections and medications. Plaintiff never reported improvement in his symptoms as a result of these treatments, and his reports of pain escalated to the point where Dr. Bond ordered a third MRI of the cervical spine. The third MRI, which was performed on June 28, 2002, revealed no change from prior studies. Additionally, despite the Commission's Order, plaintiff continued in his refusal to fully participate in vocational *Page 6 
rehabilitation efforts by never providing documentation of a self-directed job search, not keeping records of people he was contacting, displaying a negative demeanor throughout the vocational rehabilitation process about his ability to perform any work, bringing an ice pack to an interview, or listing his PPD rating on his application, and as a result, he received no job offers. Ms. Moreau specifically opined that if plaintiff had cooperated with his course of vocational rehabilitation, he would have found employment.
12. Plaintiff refused to cooperate with reasonable vocational rehabilitation efforts pursuant to a February 21, 2002 Order from August 1, 2002 through January 15, 2003.
13. After Dr. Bond stated on January 15, 2003 that plaintiff was no longer capable of working, plaintiff's course of vocational rehabilitation with Ms. Moreau terminated.
14. Plaintiff has not worked or looked for work of any kind since January 15, 2003.
15. Plaintiff was not getting better under Dr. Bond's care, and was referred to see Dr. O. Del Curling for a neurosurgical consultation and IME regarding his neck on April 15, 2003. Dr. Curling reported that the etiology of plaintiff's symptoms were unclear, noting that his assessment was clouded by plaintiff's demonstration of a degree of symptom magnification behavior. While he suspected that C6 radiculopathy may have been responsible for some of plaintiff's complaints, he suggested a cervical myelogram and a post myelogram CT to determine if there was compression at the C6 root. After reviewing the results of the CT myelogram performed on June 24, 2003, Dr. Curling was able "to rule out a left cervical radiculopathy as a source of plaintiff's pain." Dr. Curling could not find any medical explanation clearly identifying a source of plaintiff's complaints of pain, and specifically noted that "the symptom magnification and chronic pain presentation clouds the picture, and makes accurate assessment of his situation more difficult." *Page 7 
16. Dr. Curling stated that he would not causally relate plaintiff's current problems to his December 28, 2003 work accident. Dr. Curling stated that the degenerative changes detected by plaintiff's myelogram were not caused by his work accident, as these were multi-level changes throughout the cervical spine, and those degenerative changes would not account for the pain syndrome plaintiff reported. Further, he stated that while plaintiff's 1998 accident "could have" aggravated his pre-existing degenerative condition, it was his opinion that plaintiff's current condition was not causally related to that aggravation because those degenerative cervical findings do not cause pain in the left arm. In sum, Dr. Curling explained that causation could not be established in this case because the identification of a pathology was lacking: ". . . [W]hen it comes to causality issues, we look at what pathology is there; but then we have to decide does that pathology correlate with the patient's symptoms. And the . . . pathology we've been discussing [degenerative cervical spondylosis] doesn't correlate with the symptoms."
17. On November 4, 2003, plaintiff underwent an IME for his shoulder with orthopedic surgeon Dr. Frank J. Rowan. Dr. Rowan examined plaintiff, and reviewed his medical records and surveillance tapes that showed plaintiff (1) walking out of Lowe's carrying a 10-15 pound pack in his left arm, and using his left hand to lift the bag and place it in the trunk, and (2) driving with both hands on several occasions throughout 1999-2002. Contrary to the videos, both plaintiff and his wife told Dr. Rowan that his pain was so bad that he could not do chores around the house, and that he had been unable to drive a car since the accident. Dr. Rowan also employed validity measures in his examination that revealed that plaintiff was engaging in symptom magnification. For example, when Dr. Rowan would distract plaintiff he could move his arm or head and it would not cause plaintiff any pain, but when he did the same motions and plaintiff was paying attention plaintiff would indicate that the movements cause him *Page 8 
pain. Based on this assessment, Dr. Rowan concurred with Dr. Curling's findings. He also indicated that "In my opinion he needs no further medical treatment and needs to get back to work within the FCE guidelines although he may very well be able to do more work than what is in the guidelines." Dr. Rowan opined there was "no assignable rating to his shoulder for any work-related injury in 1998," and that plaintiff currently "has no injury causally related to any incident in 1998."
18. On November 25, 2003, plaintiff underwent a second FCE. The results of the FCE were invalid due to overall symptom exaggeration and failure to comply with testing. He passed only 4/15 validity criteria during the FCE, 27%, which suggests very poor effort or voluntary submaximal effort which is not necessarily related to pain, impairment or disability. Despite plaintiff's marked submaximal effort, the FCE revealed plaintiff to be capable of performing work at least at the sedentary-light duty level. Both Dr. Curling and Dr. Rowan testified that there was no medical reason why plaintiff could not have participated fully in this FCE.
19. Plaintiff's failure to give maximal effort and fully participate in the November 25, 2003 FCE amounts to a refusal to submit to a medical examination ordered by defendants.
20. On June 1, 2004, plaintiff was ordered to undergo and fully participate in an additional vocational evaluation with the Wilkes County Vocational Workshop. The Workshop involved a twelve-day program involving evaluation of work methods and a review of interviewing and job application skills. There were only three work simulations involved, and any could be performed while sitting or standing: (1) "Folding instruction sheets" entailed folding pieces of paper into quarters and setting them aside; (2) "Assembling dusters" entailed sliding a duster onto a plastic handle and then tying a leather string through a hole at the end of *Page 9 
the handle; and (3) "Sleeving sponges" entailed placing a sponge into a sleeve, and then placing the sleeved sponge in a box.
21. Plaintiff reported to Vocational Workshop on August 30, 2004 when he was given an orientation and tour, did no work, and left by 10:30am. Plaintiff only attended for seven out of twelve days, and put forth minimal effort while he was there. In fact, he failed to stay longer than an hour on any of the days he did attend, and his productivity was very low.
22. Dr. Curling indicated that plaintiff's participation in this program was "poor," and opined that he would expect that plaintiff was capable of carrying out all the activities required by the workshop if he chose. Similarly, Dr. Rowan stated there was no orthopedic reason why plaintiff could not have fully participated in the program.
23. Plaintiff's refusal to fully submit to the vocational evaluation with the Wilkes County Vocational Workshop amounts to a refusal to submit to an examination ordered by the Commission.
24. On November 17, 2004, plaintiff saw Dr. Hans C. Hansen of the Pain Relief Centers in Conover, North Carolina for a pain management evaluation. Dr. Hansen recommended some interventional measures to treat plaintiff's ongoing complaints of pain, and also recommended tapering off plaintiff's six-year narcotics regime, and opined that plaintiff was capable of returning to work on a graduated basis.
25. Both Dr. Curling and Dr. Rowan opined that plaintiff is capable of at least performing light duty work pursuant to the November 25, 2003 FCE, and that he is likely capable of more.
26. Dr. Bond admitted that plaintiff was never concretely diagnosed with anything but a neck sprain, that all objective testing including three MRI's, two EMGs, and a CT myelogram *Page 10 
revealed no significant objective findings, and that every other doctor assessing plaintiff throughout the course of his treatment found plaintiff was capable of performing some kind of work, but nonetheless testified that his opinion was that plaintiff is totally disabled to perform any kind of work.
27. Having considered all of the evidence of record, greater weight is afforded to the opinions provided by Dr. Curling and Dr. Rowan, and to the other competent evidence of record.
28. Having considered all of the evidence of record, the undersigned finds as fact that plaintiff has failed to meet his burden of proving he is medically incapable of performing any kind of work. Furthermore, the undersigned finds that plaintiff never engaged in a reasonable job search. Moreover, plaintiff has failed to offer any expert or vocational evidence proving that a job search would be futile due to vocational limitations. To the contrary, Ms. Moreau thought it would not be futile for plaintiff to engage in active job search. As such, plaintiff has failed to meet his burden of proving he remains totally disabled.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff's current conditions are not causally related to his work accident of December 23, 1998. As such, defendants are entitled to terminate payment of plaintiff's disability benefits and medical compensation. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has failed to meet his burden of proving that he remains totally disabled as a result of his 1998 work injury. Russell v. Lowe'sProduct Distribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457
(1993). *Page 11 
3. During the period of August 1, 2002 to January 31, 2003, plaintiff failed to comply with a February 21, 2002 Order of the Commission that he comply with reasonable vocational rehabilitation efforts, and therefore his benefits should have been suspended for that time period. As such, defendants are entitled to a credit for temporary total disability payments made during that time. N.C. Gen. Stat. §§ 97-25, 42.
4. Further, due to plaintiff's refusal to fully participate in the November 25, 2003 FCE and later refusal to fully participate in the vocational evaluation ordered by the undersigned, plaintiff's benefits should be suspended. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim for continued worker's compensation benefits associated with injury by accident of December 23, 1998 is DENIED, and defendants are entitled to the immediate cessation of payment of indemnity and medical compensation.
2. Defendants are entitled to a credit for payments already made from the period of August 1, 2002 to January 31, 2003. Defendants are additionally entitled to a credit for payment of disability benefits paid since November 25, 2003.
3. Each side shall bear its own costs.
This the ___ day of March, 2006.
 S/_____________
 BUCK LATTIMORE
 CHAIRMAN *Page 12 
CONCURRING:
S/_____________ DIANNE C. SELLERS COMMISSIONER
S/_____________ THOMAS J. BOLCH COMMISSIONER *Page 1